UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Alaaeldin S. Ahmed<br>    Plaintiff,<br><br>v.<br><br>CITY OF NEW YORK; **Eric Adams**, in his official capacity as Mayor of the City of New York; **Edward A. Caban**, in his official capacity as Police Commissioner for the City of New York; **Rebecca U. Weiner**, in her official capacity as Deputy Commissioner of Intelligence for the City of New York,<br><br>    Defendants. | **24 CV 1702**<br>**COMPLAINT**<br><br>Case No. _____<br><br>Hon. _ _ _ _ _ |

## INTRODUCTION

1. Since 2002, the New York City Police Department ("NYPD") has engaged in an unlawful policy and practice of religious profiling and suspicionless surveillance of Muslim New Yorkers. This policy and practice has a false and unconstitutional premise: that Muslim religious belief and practices are a basis for law enforcement scrutiny.

2. As documented extensively in the NYPD's own records, its Intelligence Division has singled out Muslim religious and community leaders, mosques, organizations, businesses, and individuals for pervasive surveillance that is not visited upon the public at large or upon institutions or individuals belonging to any other religious faith. That surveillance has included the mapping of Muslim communities and their religious, educational, and social institutions and businesses in New York City (and beyond); deploying NYPD officers and informants to infiltrate mosques and monitor the conversations of congregants and religious leaders without any suspicion of wrongdoing; and conducting other forms of suspicionless surveillance of Muslim individuals, organizations, and institutions, including through the use of informants and monitoring of websites, blogs, and other online forums. Information collected from these

activities has been entered into intelligence databases. According to the commanding officer of the NYPD's Intelligence Division, its mapping activities have not generated a single lead, nor led to a single terrorism investigation.

3. The unlawful policy and practice that these activities reflect are referred to here as the NYPD's "Muslim Surveillance Program." Through the Muslim Surveillance Program, the NYPD has imposed an unwarranted badge of suspicion and stigma on law-abiding Muslim New Yorkers, including Plaintiffs in this action.

4. Plaintiff is Muslim New Yorker —caught in the dragnet of the NYPD's sweeping Muslim Surveillance Program. Among other violations, Plaintiff has been variously subjected to unlawful surveillance by NYPD informants, pictures, videocameras, and plainclothes officers, all based on his religion and without any evidence of wrongdoing.

5. As a result of unlawful NYPD spying, the Plaintiff's personal life, professional life, and career have been profoundly affected. The Plaintiff was abruptly laid off from their first job where the NYPD intervened, without receiving any compensation package that had been provided to previously laid-off employees. Additionally, ever since the NYPD's involvement at their current workplace, New York Presbyterian Hospital - Cornell Medical Center, the Plaintiff has faced suspicion from coworkers and experienced ongoing harassment and discrimination. Despite their deserving qualifications, the Plaintiff has been consistently denied well-deserved promotions and minimal salary increases each year, compounded by unfair performance evaluations. Moreover, the Plaintiff's requests for training have been repeatedly denied, while the hospital has sent other Information Technology staff for MBA and unrelated disciplines, neglecting their professional development in the information technology field.

6. Through this action, Plaintiff seeks a declaration that the NYPD's policy and practice of subjecting him to suspicion-less surveillance because of his Muslim faith violates his fundamental rights to equal protection and free exercise of religion under the U.S. Constitution and the Constitution of the State of New York, and the guarantee of government neutrality toward all religions under the U.S. Constitution. Plaintiff also seek an injunction

against the continuation of the NYPD's unconstitutional policy and practices, and an order requiring the NYPD to destroy the information about him that it has secretly collected in violation of his constitutional rights.

## JURISDICTION & VENUE

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983 because this lawsuit alleges violations of the U.S. Constitution and raises questions of federal law. Jurisdiction is also based upon 28 U.S.C. § 1343 because the lawsuit seeks relief for the deprivation of Plaintiffs' constitutional rights under color of state law.

8. This Court has the authority to grant declaratory and injunctive relief, and any other appropriate relief pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and 2202. A substantial, actual, and continuing controversy exists between the parties with respect to the Plaintiffs' claims for declaratory and injunctive relief.

9. Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

10. Plaintiff Alaaeldin Saber Ahmed is a U.S. citizen who is a resident of Brooklyn, New York, with his wife and 3 children. Columbia University graduate and employed by New York Presbyterian hospital as Hardware analyst II in the IT department. Since at least 2002, Alaaeldin has been subject to NYPD surveillance.

Defendant City of New York ("the City") is a municipal corporation duly incorporated and existing under the laws of the State of New York. The City of New York has established and maintains the NYPD as a constituent department of the City. At all relevant times, the City, acting through the NYPD, was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and was responsible for the appointment, training, supervision, and conduct of all NYPD personnel. In addition, at all relevant times, the City was responsible for ensuring that NYPD personnel obey the laws of the United States and New York State.

11. Defendant **Eric Adams** is the Mayor of the City of New York, with supervisory authority over the NYPD. He is sued here in his official capacity.

12.     Defendant **Edward A. Caban** is the Police Commissioner for the City of New York, with supervisory authority over all officers and operations of the NYPD, including responsibility for training, recruiting, and managing all members of the NYPD Intelligence Division. He is sued here in his official capacity.

13.     Defendant **Rebecca U. Weiner** is the Deputy Commissioner of Intelligence for the City of New York, with supervisory authority over the NYPD's Intelligence Division. In that role, Defendant Weiner oversees the gathering, analysis, and distribution of intelligence, and is responsible for training, recruiting, and managing all members of the NYPD Intelligence Division. She is sued here in her official capacity.

## FACTUAL ALLEGATIONS

### A. The NYPD's Muslim Surveillance Program

14.     Since at least 2002, the NYPD has conducted its Muslim Surveillance Program through its Intelligence Division, which currently includes, or previously included: (1) the Demographics Unit (which was renamed the Zone Assessment Unit in 2010); (2) the Intelligence Analysis Unit; (3) the Cyber Intelligence Unit; and (4) the Terrorist Interdiction Unit. The NYPD developed its Muslim Surveillance Program under the leadership of David Cohen, a retired thirty-five-year veteran of the Central Intelligence Agency, who became the NYPD's Deputy Commissioner for Intelligence in 2002. David Cohen retired from the NYPD in December 2013.

15.     The analytic underpinnings of the Muslim Surveillance Program are reflected in a 2007 report titled "Radicalization in the West: The Homegrown Threat," written by two senior analysts in the NYPD Intelligence Division, and published by the NYPD (the "NYPD Radicalization Report"). The NYPD Radicalization Report claims to identify a linear, four-stage "radicalization process" by which individuals transform into terrorists. The process laid out in the NYPD Radicalization Report draws a broad profile and treats with suspicion those who identify as Muslim, harbor Islamic beliefs, and/or engage in Islamic practices.

16.     According to the NYPD Radicalization Report, "[e]nclaves of ethnic populations that are largely Muslim often serve as 'ideological sanctuaries' for the seeds of radical thought." Within these "Muslim enclaves," the report claims that potential terrorists could range from members of middle-class families to "successful college students, the unemployed, the second and third generation, new immigrants, petty criminals, and prison parolees." It identifies as so-

4

called "radicalization incubators" places frequented by Muslims, including mosques, "cafes, car driver hangouts, flophouses, . . . student associations, nongovernmental organizations, hookah (water pipe) bars, butcher shops and book stores." It also purports to identify as radicalization "indicators" First Amendment-protected activities in which many, if not most, religious Muslims participate—including "wearing traditional Islamic clothing [and] growing a beard," abstaining from alcohol, and "becoming involved in social activism and community issues."

17. The NYPD Radicalization Report stigmatizes an entire faith community and invites discrimination. It specifically singles out Muslims for profiling and suspicionless surveillance because of their religious beliefs and practices. Although the NYPD claimed in 2009 that its Radicalization Report "was not intended to be policy prescriptive," upon information and belief, the NYPD Intelligence Division continues to conduct suspicionless surveillance of Muslim New Yorkers in accordance with the framework set out in the report.

18. The NYPD's own documents show that, beginning in at least 2003, the Intelligence Division carried out the Muslim Surveillance Program by identifying, locating, and mapping Muslim New Yorkers based on a list of "ancestries of interest." The NYPD used U.S. census data and information from I-9 immigration forms and government databases to locate significant Muslim populations within New York communities associated with these "ancestries of interest."

19. The "ancestries of interest" include "American Black Muslims" and twenty-eight countries or regions that represent eighty percent of the global Muslim population: Afghanistan, Albania, Algeria, Bahrain, Bangladesh, Chechnya, Egypt, Guyana, India, Indonesia, Iran, Iraq, Jordan, Lebanon, Libya, Morocco, Pakistan, Palestine, Saudi Arabia, Somalia, Sudan, Syria, Tunisia, Turkey, the United Arab Emirates, Uzbekistan, Yemen, and Yugoslavia. All but three of these countries or regions have majority Muslim populations. One of those remaining three countries—India—is home to eleven percent of the world's Muslim population.

20. The NYPD's mapping efforts specifically excluded non-Muslims from law enforcement scrutiny. For example, the Intelligence Division's Demographics Unit mapped Iranian community institutions in one NYPD document, but specifically noted when those persons and institutions were Jewish or Christian—not Muslim—and therefore not of interest to the NYPD. In a report mapping the Egyptian community in 2007, the NYPD noted that Coptic Christian Egyptians were "the majority of the Egyptian community in New York City. This report does not represent the Coptic Egyptian community and is merely an insight into the

5

Muslim Egyptian community of New York City." Similarly, in its 2007 map of the Syrian community in New York City, the NYPD stated that the community is "divided into two parts, a Jewish Syrian and a Muslim Syrian community with the Jewish community being the larger of the two. This report will focus on the smaller Muslim community." Although the NYPD acknowledged the religious diversity in New York's Albanian population, police officials only mapped and photographed Albanian mosques for the NYPD's Demographics Report on Albanians.

21. The NYPD further identified at least 263 so-called "hot spots"—such as cafés, bookstores, and restaurants—owned or frequented by Muslims.

22. The NYPD dispatched teams of plainclothes officers known as "rakers" into neighborhoods with concentrated communities associated with Muslim "ancestries of interest" to monitor daily life in those communities. In addition, the NYPD has engaged informants to conduct suspicionless surveillance of Muslims. So-called "seeded" informants work or reside in certain ethnic neighborhoods and report to the police on neighborhood happenings. "Directed" informants gather information from locations that rakers have identified as "hot spots," notwithstanding the absence of any indication of criminal activity.

23. Although the NYPD's dragnet Muslim Surveillance Program has swept up Muslims as a faith community, specific Muslim individuals, organizations and groups have been further singled out by the NYPD because of real or perceived stronger devotion to their faith or to particular Islamic beliefs. For example, the NYPD sent officers and informants to spy on "hot spots" that were particularly identified as having "'devout clientele.'" In addition, the NYPD has targeted individuals and mosques that it identified as having "ties to Salafism." The NYPD defined Salafi in its Radicalization Report as "a Sunni revivalist school of thought that takes the pious ancestors of the early period of early Islam as exemplary models." The NYPD has also singled out for suspicionless surveillance Muslim religious institutions and leaders it perceives as particularly influential in the community.

24. Among the institutions on which the NYPD has specifically focused its suspicionless surveillance are mosques, which are central to Muslim religious life. The NYPD identified and mapped more than 250 area mosques in New York and neighboring states. NYPD officials then determined the "ethnic orientation, leadership, and group affiliations" of each mosque, either by surveilling it from the outside, or by entering the mosque to make those

6

determinations. Using rakers and informants, the NYPD identified fifty-three "mosques of concern" in which the Department placed additional informants and plainclothes officers.

25. The NYPD has placed video cameras outside of mosques to surveil congregants and collected license plate numbers of worshippers attending certain mosques, without any suspicion of criminal activity.

26. Upon information and belief, Defendant Cohen intended to place an NYPD source in every mosque within a 250-mile radius of New York City and succeeded in placing a source in many of them.

27. The NYPD has instructed its officers and informants to spy on and record the First Amendment-protected speech and activities of Muslim religious and community leaders and members, including students and activists. Informants known informally as "mosque crawlers" are specifically dispatched to monitor sermons, scrutinize imams, record conversations, and collect lists of mosque attendees, all absent evidence of wrongdoing. The NYPD's own documents show that informants have recorded conversations among mosque congregants about current events, such as the Danish cartoon controversy in early 2006 and the accidental crash of a plane into a Manhattan building in October 2006.

28. The NYPD's mapping activities and its use of officers and informants to monitor and record Muslim New Yorkers' conversations without any suspicion of wrongdoing continue. According to the current commanding officer of the NYPD's Intelligence Division, members of the Division may be instructed to record and report on Muslim New Yorkers' conversations to determine whether they are "upset" about world events, such as "a drone attack," or discussing information that would "identify what region or what type of people they are."

29. The NYPD has also instructed and trained informants to bait Muslim New Yorkers into making inflammatory remarks, which are then reported to the police. One such technique is known as "create and capture," by which an informant "creates" a conversation with a Muslim New Yorker about jihad or terrorism and then "captures" and reports that individual's response to the NYPD.

30. For example, in January 2012, a plainclothes NYPD officer recruited nineteen-year-old Shamiur Rahman to serve as an informant following his third arrest on misdemeanor drug charges. Rahman was instructed to use the "create and capture" technique.

31.  The NYPD paid Rahman as much as $1,500 a month to: monitor conversations in mosques and among Muslim youths; listen for buzz words such as "jihad" and "revolution" and report any "radical rhetoric"; photograph imams and congregants inside mosques; collect congregants' cell phone numbers; and collect and photograph the names of people attending study groups and classes on Islam. Rahman provided all of this information to the NYPD, even though none of it pertained to actual or suspected criminal activity of any kind.

32.  For example, on the NYPD's instructions, Rahman attended the 2012 Muslim Day Parade in Manhattan and took pictures of people marching, which he sent to the NYPD. The NYPD also assigned Rahman to spy on a February 23, 2012 lecture at the John Jay College of Criminal Justice, even though Rahman's NYPD handler admitted to him that the police did not believe the Muslim Student Association there had done anything wrong. Rahman's NYPD handler told him that the group should be monitored because its members were "religious Muslims" and "the NYPD considers being Muslim a terrorism indicator."

33.  The NYPD continues to use officers and informants to monitor mosques, sermons, imams, and congregants. The NYPD does not conduct similar profiling or surveillance of individuals, houses of worship, or organizations affiliated with any religion other than Islam.

34.  As part of the NYPD's Muslim Surveillance Program, the Intelligence Division generated daily reports on innocent Muslim New Yorkers' lives in New York City's neighborhoods, and the names of thousands of innocent New York City residents have been placed in secret police files, even absent evidence that they engaged in criminal activity.

35.  The information gathered by the Intelligence Division is kept both in an intelligence database and on a standalone computer used to generate intelligence reports.

36.  The highest-ranking New York City and NYPD Officials have embraced the Muslim Surveillance Program, defended it, and indicated that it will continue. Ex-mayor Bloomberg when in office has stated that, "We're doing the right thing. We will continue to do the right thing." He has asserted that criticism of the NYPD's targeting of Muslims for surveillance was "just misplaced" and "pandering."

37.  None of the NYPD's suspicionless surveillance activities described here is conducted against institutions or individuals belonging to any faith other than Islam, nor are they conducted against the public at large.

B. **Plaintiff' Allegations**

### NYPD Surveillance of Alaaeldin S. Ahmed

38. During the early 2000s, I frequented a nearby Mosque that was conveniently located just one block away from my current residence. It remains vivid in my memory that I had engaged in conversations with two individuals who would occasionally visit the Mosque. It later came to my attention that these individuals were actually informants for the New York City Police Department (NYPD), actively gathering information and constantly moving from one location to another. Prior to the initiation of the NYPD Surveillance program, these two individuals were known to be unemployed. However, their circumstances changed once they became involved in this program. Unfortunately, the Mosque eventually faced closure due to intervention from the NYPD. This intervention followed a lawsuit filed by the Mosque's imam against the NYPD for alleged tampering with his immigration application for a green card. As a result of this legal case, the court granted the imam the green card he sought.

39. In 2007, I was hired full-time by New York Presbyterian Hospital after working on a contracting basis for 7 months. During the background check process, the hospital discovered a note from the New York Police Department requesting that they be contacted if I was being considered for employment at any workplace. In response, my direct manager, James P Cox, reached out to the department, and they subsequently conducted a presence at the hospital for approximately 7 months. It became apparent that the background check conducted by the NYPD had been misused and utilized for a purpose that violated the laws governing its use.

40. Over the course of the past 14 years, I have unfortunately experienced a lack of career advancement opportunities compared to my co-workers. While my colleagues were consistently promoted and advanced, I remained in the same position, feeling left behind. Moreover, false accusations of wrongdoing were circulated by my co-workers, causing further harm and tarnishing my reputation. Additionally, during yearly performance reviews, I consistently received the minimum rating, regardless of my actual accomplishments throughout the year. These reviews lacked genuine discussion and seemed predetermined. Furthermore, despite the IT department having sufficient budgetary resources to grant training requests, I was repeatedly denied access to necessary training opportunities. Interestingly, Other individuals were granted more costly and diverse training programs. The mistreatment continued with my immediate manager using derogatory language, constantly belittling me with demeaning comments. I also faced continuous harassment, being told that I was not capable of performing my duties and that I should leave. Moreover, my annual salary increases were consistently the lowest in the team, often ranging from only 1% to 1 1/4% per year. To make matters

9

worse, I discovered that my co-workers were surveilling my activities, including what I ate, the work I did, and even my vacation time. Furthermore, I was consistently kept in the dark regarding work-related matters, with vital information being deliberately withheld from me. Lastly, I have discovered that the NYPD, through their surveillance efforts, has been divulging details of my personal life within the confines of my own home to my co-workers, thereby invading the privacy of my wife and three young daughters, who are all American citizens.

41. Due to the surveillance conducted by the NYPD, I faced significant obstacles in changing jobs or even being considered for the positions Iapp lied for within the hospital. Despite submitting applications, I never received any responses or interview opportunities. Interestingly, I observed that some consultants were able to transition from consultant work to the positions I had applied for.

42. The constant surveillance and monitoring of my every move, conducted by the NYPD and their informants, has had a profound impact on my personal life, causing a rift between my family, friends, and myself. The intrusive surveillance extended to tracking the locations of my wife and daughter through their phones, invading their privacy as well. Additionally, the surveillance extended to monitoring our internet activities, phone conversations, and any other means of communication, using the gathered information to undermine our personal and professional endeavors. False rumors and accusations were spread about me, creating a toxic environment and tarnishing my reputation. As a result of the distress caused by the practices and policies of the NYPD, I have been required to take anxiety medication since their initial involvement in my life.

43. During my travels to Egypt, Lebanon, Italy, and France, I experienced a disturbing pattern of surveillance and monitoring that mirrored the methods and policies employed by the NYPD in New York City.

44. The surveillance conducted by the NYPD had a detrimental impact on my efforts to expand my healthcare side business, particularly during my trip to France for TFWA 2022. False accusations spread by the NYPD resulted in my inability to conduct business with any company at the exhibition and the loss of my luggage at JFK airport in New York. Despite filing a lost luggage claim with Royal Air Maroc, I have yet to receive my luggage or the compensation entitled to me under the IATA rules. The lost luggage contained vital samples, company information, and contact details necessary for four days of work. The financial implications of this incident amount to approximately 5,000 - 6,000 US dollars. Baggage Incident JFKAT16652 - Flight: AT777/AT200 on 11/10/2022 - Itinerary: ORY/CMN/JFK

45. The NYPD employed these methods to effectively restrict my freedom within the hospital, creating an atmosphere of confinement and holding me as if I were in a holding place.

10

Additionally, when they sensed that I was attempting to leave the hospital or New York City, I received verbal threats.

I have been facing significant challenges when it comes to receiving the rightful medical care I deserve. It seems that there have been instances where the NYPD has allegedly engaged in surveillance of my communications, resulting in interference with my scheduled doctor appointments and leading to subpar care. This surveillance has also made it difficult for me to obtain the necessary medication and complete my prescriptions. Furthermore, I have encountered obstacles in accessing justice, as I have been unable to find legal representation for my current case or for a previous incident where the NYPD, in collaboration with a hospital, conspired to send me to a psychiatric emergency room against my will, resulting in an involuntary stay in an inpatient psychiatric unit.

In addition to these issues, there have been rumors spread about my involvement in shoplifting, which has led to harassment and discomfort whenever I visit various stores .

# CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

### VIOLATION OF THE FOURTEENTH AMENDMENT
### EQUAL PROTECTION CLAUSE
### Jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 1983

### (Against all Defendants by Plaintiff)

38. As set forth above, Defendants have engaged in a policy and practice of targeting Plaintiff for police surveillance because of Plaintiff's adherence to and practice of the religion of Islam. By intentionally singling out Plaintiff in this manner, Defendants have stigmatized him as members of a religious community and condemned their religion as one that is the subject of intense suspicion and distrust, different from any other religion. Defendants' policy and practice is discriminatory in purpose and effect. It does not serve a legitimate government interest and is not narrowly tailored. By discriminating against Plaintiff in this manner, Defendants have violated the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and will continue to do so if Plaintiff is not afforded the relief sought below.

## SECOND CLAIM FOR RELIEF

### VIOLATION OF THE FIRST AMENDMENT
### RIGHT TO FREE EXERCISE OF RELIGION
### Jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 1983

### (Against all Defendants by Plaintiff)

39. As set forth above, Defendants have engaged in a policy and practice of targeting Plaintiff for police surveillance because of Plaintiff's adherence to and practice of the religion of Islam. This policy and practice is not neutral or one of general applicability, and has placed a substantial burden on Plaintiff religious exercise in the practice of their faith. It has unjustifiably subjected Plaintiffs to adverse treatment because of their religion. It does not serve a legitimate government interest and is not narrowly tailored. As a result, Defendants have violated the Free Exercise Clause of the First Amendment to the United States Constitution and will continue to do so if Plaintiff is not afforded the relief sought below.

### THIRD CLAIM FOR RELIEF

### VIOLATION OF THE NEW YORK STATE CONSTITUTION
### RIGHT TO FREE EXERCISE OF RELIGION, ARTICLE I, § 3
### Jurisdiction under 28 U.S.C. § 1367

#### (Against all Defendants by Plaintiff)

40.     As set forth above, Defendants have engaged in a policy and practice of targeting Plaintiff for police surveillance because of Plaintiff's adherence to and practice of the religion of Islam. This policy and practice is not neutral or one of general applicability, and has placed a substantial burden on Plaintiffs' religious exercise in the practice of their faith. It has unjustifiably subjected Plaintiff to adverse treatment because of their religion. It does not serve a legitimate government interest and is not narrowly tailored. As a result, Defendants have violated Article I, § 3 of the New York State Constitution and will continue to do so if Plaintiffs are not afforded the relief sought below.

### FOURTH CLAIM FOR RELIEF

### VIOLATION OF THE FIRST AMENDMENT
### ESTABLISHMENT CLAUSE
### Jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 1983

#### (Against all Defendants by Plaintiff)

41.     As set forth above, Defendants have engaged in a policy and practice of targeting Plaintiffs for police surveillance because of Plaintiffs' adherence to and practice of the religion of Islam. This policy and practice has stigmatized Plaintiffs, and makes explicit and intentional distinctions between Plaintiffs and individuals or institutions belonging to any other religious group. It has had the effect of inhibiting Plaintiffs' religious goals, conduct, and practice, and fosters an excessive government entanglement with religion by, among other things, subjecting Plaintiffs to intrusive surveillance, heightened police scrutiny, and infiltration by police informants and officers. It does not serve a legitimate government interest and is not narrowly tailored. By targeting Plaintiffs for police surveillance because of Plaintiffs' religious beliefs and practices, Defendants have violated the Establishment Clause of the First Amendment of the

United States Constitution and will continue to do so if Plaintiffs are not afforded the relief sought below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully request judgment against Defendants as follows:

1. Declaring that the policies, practices, acts, and omissions of Defendants described here are unlawful and violate Plaintiff' rights under the Constitution of the United States and the Constitution of the State of New York;

2. Permanently enjoining the Defendants and their agents, employees, successors, and all others acting in concert with them, from subjecting Plaintiffs to the unconstitutional and unlawful practices described here;

3. Ordering Defendants to expunge all records of Plaintiffs created and maintained as a result of the unconstitutional and unlawful practices described here;

4. Prohibiting Defendants from engaging in surveillance or other law enforcement activity based solely or predominantly upon the religion of the individuals or institutions against whom that surveillance or law enforcement activity is directed;

5. Appointing a monitor to ensure that the City of New York complies with the injunction provisions of any decree that the Court enters, and entering an order retaining jurisdiction over this action to ensure that the City complies with such a decree;

6. Ordering the defendants to expunge all records and information pertaining to the plaintiff that were communicated and shard with both official and non-official authorities of the countries visited by plaintiff. These records pertain to instances where plaintiff was under surveillance by the NYPD;

7. Awarding pre-judgment and post-judgment interest, to the fullest extent allowable by law, on the foregoing monetary awards; and

8. Granting such other and further relief that the Court deems just and proper.

Dated: March 5, 2024

Respectfully submitted,

Alaaeldin Ahmed

646-995-8671
Aasaber2@gmail.com

*[signature]*